STATE OF WEST VIRGINIA

*v.*

ROBERT LEE CRAFT

(No. 14138)

STATE OF WEST VIRGINIA

*v.*

ROCKY LEONARD CRESCE

(No. 14139)

Decided October 28, 1980.

*Donald L. Pitts* for defendants.

*Chauncey H. Browning*, Attorney General, *Gregory W. Bailey*, Deputy Attorney General, *Curtis G. Power, III*, Assistant Attorney General, for plaintiff.

MILLER, JUSTICE

Robert L. Craft, Rocky L. Cresce and Stephen N. Keffer were convicted in the Circuit Court of Nicholas County of breaking and entering. Two of the defendants, Craft and Cresce, appeal their convictions, raising issues of (1) the insufficiency of the evidence, (2) illegal search and seizure, and (3) the admissibility at trial of evidence of other crimes.[1]

The defendants were convicted of breaking and entering LeRose Motors, Inc., in Summersville, Nicholas County. There were no witnesses to the breaking and entering, and no evidence discovered at the scene to connect the defendants to the crime. The evidence introduced at trial was circumstantial, based primarily upon the defendants' possession of the stolen items shortly after the commission of the breaking and entering.

The defendant Craft is a resident of Mercer County, and the defendants Cresce and Keffer are residents of

---

[1] The defendants were tried together as coparticipants in the breaking and entering; and, since they raise similar issues on appeal, the cases have been consolidated.

Fayette County. The general manager of LeRose Motors testified that the three defendants arrived at LeRose Motors at 7:30 p.m. on September 2, 1976, traveling together in a 1966 Buick. Craft spent some time with the manager discussing the possible purchase of an automobile and the trade-in of his 1966 Buick. The defendants departed without consummating a purchase.

The manager further testified that he again encountered the three defendants later the same evening at the Nicholas County Fair, and engaged them in casual conversation. The record does not indicate at what time this conversation took place.

LeRose Motors closed for the evening at 10:00 p.m. Some time after the closing, a door was forcibly opened and a number of tools were stolen, including a screwdriver, a crescent wrench, a pair of pliers, a chisel, a cutting torch and hoses, a pipe wrench, a hammer, and a mechanic's cloth. Additionally, three state inspection stickers were missing. The breaking and entering was undetected until 7:00 a.m. the following morning, September 3, 1976, when LeRose Motors opened for business.

Earlier the same morning, at about 12:30 a.m., two Summersville police officers, Garry Evans and Curtis Persinger, while on patrol, observed a vehicle stop on Broad Street in Summersville and discharge two passengers who then ran toward Halstead's Foodland store. The officers stationed themselves behind the store, where they observed one of the suspects climb to the roof and receive a valise passed to him by the other suspect, who then ran from the store.

The officers called for assistance from the Summersville police, the sheriff's department, and the state police. When assistance arrived, Patrolman Persinger remained stationed behind the building while Patrolman Evans and a deputy sheriff entered the building and climbed to a window which overlooked a portion of the roof. Patrolman Evans testified that he shined his flash-

light through the window and observed a suspect in the beam of light who passed within ten feet of the window.

The suspect then jumped from the rooftop and ran up a path leading to the point where Patrolman Persinger was stationed. Patrolman Persinger testified that he shined his flashlight on the suspect's face as the suspect approached within 15 or 20 feet of him, and ordered the suspect to halt. The suspect hesitated, then jumped into the brush and escaped. A search of the rooftop revealed a valise which contained a number of the tools that were subsequently reported to be stolen from LeRose Motors.

Following the escape, the police officers set up road-blocks in the area and provided a description of the suspect seen on the rooftop based upon the observations of Patrolmen Evans and Persinger. At 3:30 a.m., a deputy sheriff who was involved in the search stopped to examine a 1966 Buick that was parked at the side of a public road. He testified that he discovered the defendant Keffer hiding behind the vehicle, and the defendant Cresce sitting below a nearby embankment. The deputy described both as being in a state of intoxication and placed them under arrest for public intoxication. The car was impounded and its license revealed it registered to the defendant Craft.

Craft was arrested by a state policeman at 7:30 a.m. in a nearby park, after a report had been received that a man fitting the description of the suspect on the Foodland rooftop was seen in the park. Craft was then taken to Patrolman Persinger who identified him as the suspect he had seen escaping from the rooftop.

The Summersville police obtained written consent from Craft to search his car for evidence pursuant to their investigation. The search revealed a screwdriver that was identified as stolen from LeRose Motors, and the three inspection stickers that were missing from LeRose.

At trial, the State produced the foregoing evidence coupled with in-court identification of the defendant

Craft by Patrolmen Evans and Persinger, based on their observations of Craft at Halstead's Foodland.

The defense consisted of testimony from all three defendants that they traveled together to Summersville but did not participate in the breaking and entering of LeRose Motors or the attempted breaking and entering into Halstead's Foodland. They testified that they stopped at LeRose Motors during business hours in order for Craft to consider the purchase of a new car.

Craft testified that while discussing the purchase with the manager, he arranged to buy three State inspection stickers which the manager promised to deliver later in the evening at the Nicholas County Fair. Craft explained the presence of the screwdriver in his car by stating that it was his own screwdriver and that he had owned it for several years.

The three defendants gave similar accounts for their early-morning presence in the Summersville area by stating that Craft became separated from the other two when he left the fair with a female companion he had met at the fair. Cresce and Keffer conceded that they had been drinking whiskey while waiting for Craft and were preparing to camp out for the night when they were arrested. Craft testified that he drank whiskey and smoked marijuana with the woman he met at the fair. He explained that he fell asleep in the woods after engaging in sexual relations and awoke alone. He then walked to the park in search of his friends and his car, at which time he was arrested.

In rebuttal, the State produced a female acquaintance of Cresce, who testified that Cresce asked her to provide an alibi for Craft in return for $500. She notified the Raleigh County sheriff's office, and under their surveillance met with Craft to elicit the details of the plan. She testified that Craft offered her the money to testify that she was his social companion on the night he was identified as a suspect. She further testified that Craft stated that Cresce and Keffer were with him in the attempted breaking and entering of Halstead's Foodland, but that

they escaped unseen. She presented no testimony regarding the possible participation of any of the three in the breaking and entering of LeRose Motors.

## I. *The Sufficiency of the Evidence*

### A. *The Defendant Robert L. Craft*

At the close of the evidence on behalf of the State, and again at the completion of all of the evidence, the defense moved for a directed verdict based on the insufficiency of the evidence. Both motions were denied by the trial court, and constitute the principal grounds raised by the defense on appeal.

Although there is ample evidence connecting the defendant Craft to the attempted breaking and entering into Halstead's Foodland, the conviction in the present case is not for that offense, but is for the earlier breaking and entering into LeRose Motors. The only substantial evidence linking Craft to the commission of this offense is his possession of the stolen goods. The defendant thus raises the question of the weight to be accorded to the possession of recently stolen goods as circumstantial evidence to support a conviction for breaking and entering. A further point of consideration is our general rule regarding circumstantial evidence.

In Syllabus Point 2 of *State v. Dobbs*, 163 W. Va. 630, 259 S.E.2d 829 (1979), we set the following circumstantial evidence rule based upon a textual statement found in *State v. Noe*, 160 W. Va. 10, 230 S.E.2d 826, 829-30 (1976), and a number of our earlier cases:[2]

> "Circumstantial evidence will not support a
> guilty verdict, unless the fact of guilt is proved

---

[2] *State v. Noe*, 160 W. Va. 10, 230 S.E.2d 826 (1976), cited the following cases as supporting its circumstantial evidence formulation: *State v. Allen*, 139 W. Va. 818, 82 S.E.2d 423 (1954); *State v. Clay*, 135 W. Va. 618, 64 S.E.2d 117 (1951); *State v. Cutlip*, 131 W. Va. 141, 46 S.E.2d 454 (1948); *State v. Hudson*, 128 W. Va. 655, 37 S.E.2d 553 (1946); *State v. Kapp*, 109 W. Va. 487, 155 S.E. 537 (1930); *State v. Snider*, 106 W. Va. 309, 145 S.E. 607 (1928); *State v. Ison*, 104 W. Va. 217, 139 S.E. 704 (1927); *State v. Whitehead*, 104 W. Va. 545, 140 S.E. 531 (1927); and *State v. Hunter*, 103 W. Va. 377, 137 S.E. 534 (1927).

to the exclusion of every reasonable hypothesis of innocence; and circumstances which create only a suspicion of guilt but do not prove the actual commission of the crime charged, are not sufficient to sustain a conviction."

Independent of the circumstantial evidence rule is the further proposition that on review of a guilty verdict conflicting evidence must be treated as having been resolved by the jury in favor of the state. This rule is a part of the general test for reviewing the sufficiency of the evidence given in Syllabus Point 1 of *State v. Starkey*, 161 W. Va. 517, 244 S.E.2d 219 (1978):

"In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done."

Entwined within the circumstantial evidence rule is the question of the weight to be accorded evidence that the defendant has possession of recently stolen goods. This Court made an extensive discussion of this issue in *State v. Etchell*, 147 W. Va. 338, 127 S.E.2d 609 (1962), based upon a review of our own cases as well as decisions from other jurisdictions, and concluded in Syllabus Point 1:

"The exclusive possession by an accused person of property recently stolen, either by simple larceny or by theft thereof from a dwelling or other building, is not of itself *prima facie* evidence that the person in whose possession the goods are found is the thief; but such possession is, nevertheless, a strong circumstance to be considered with other evidence, facts and circum-

stances properly tending to prove the guilt of such person."[3]

In addressing the amount of evidence in addition to possession that would be sufficient to justify a finding of guilt, we stated in Syllabus Point 2:

"Evidence of the exclusive possession by an accused person of recently stolen goods, corroborated by other proper evidence, facts and circumstances tending to prove guilt, may be sufficient to convict the possessor of the theft of such goods, even though the corroborating evidence, facts and circumstances alone would be insufficient to support a conviction. Whether, in such circumstances, the evidence is sufficient to establish the guilt of the accused beyond reasonable doubt is ordinarily a question of fact for the jury."[4]

In *Etchell*, the defendant had been found in possession of several hundred dollars worth of items that had been recently stolen from an automobile service station. From the evidence introduced at trial, the Court found as sufficient corroboration the defendant's presence in the vicinity at the time of the theft, the defendant's particular need for some of the stolen items, the defendant's unexplained possession of some items and unconvincing explanation of others, and an inconsistent account of his presence in a statement offered to police.

---

[3] In *State v. Stone*, ___ W. Va. ___, 268 S.E.2d 50, 55 (1980), we condemned an instruction on inferences to be drawn from the possession of recently stolen property, which instruction did not include the phrase that "it is not even prima facie evidence of guilt."

[4] *State v. Etchell*, 147 W. Va. 338, 127 S.E.2d 609 (1962), is in accord with the majority view. *See* Annot., *What Amounts to "Exclusive" Possession of Stolen Goods to Support Inference of Burglary or Other Felonious Taking*, 51 A.L.R.3d 727 (1973); Annot., *What Constitutes "Recently" Stolen Property Within Rule Inferring Guilt from Unexplained Possession of Such Property*, 89 A.L.R.3d 1202 (1979); Annot., *Modern Status: Instruction Allowing Presumption or Inference of Guilt from Possession of Recently Stolen Property As Violation of Defendant's Privilege Against Self-Incrimination*, 88 A.L.R.3d 1178 (1978).

In the present case, there are a number of circumstances that tend to corroborate the defendant Craft's participation in the breaking and entering of LeRose Motors. He and his two companions were at the scene of the offense prior to its commission. The Foodland Market is in the same vicinity as LeRose Motors, and three persons who could have been the three defendants were observed in this vicinity around midnight. Certainly, one of them was identified later as Craft. Of further significance is the fact that two of the individuals were seen handling the valise, which contained the stolen tools, and that Craft was one of them; and, he was on the rooftop of the Foodland.

Also, there was only a short lapse of time between the theft of the tools and the defendant Craft's possession of them on the rooftop of Halstead's Foodland. The immediate use of the stolen tools to facilitate another breaking and entering suggests a purpose for the earlier breaking and entering at LeRose Motors consistent with the defendant's later possession of the stolen property.

Although Craft testified at trial, he was unable to provide any alternative explanation of his possession of the stolen tools beyond a denial that he was the person with the tools on the rooftop. This denial of his presence was contradicted by two police officers who, independently, provided positive identification of him.

The Supreme Court of South Dakota considered a similar factual situation in *State v. Winckler*, 260 N.W.2d 356 (S.D. 1977), where the defendants were convicted of the theft of weapons which were found in their possession. They were apprehended during the commission of a subsequent offense in which they were using the weapons. The possession of the stolen weapons linked with their use in the commission of a subsequent offense was held to be sufficient to support a finding of guilt for the theft of those weapons.

The corroborating evidence in the present case thus appears to be sufficient, under the principles set forth in *Etchell* relating to possession of recently stolen property,

to sustain the conviction of the defendant Craft for the breaking and entering of LeRose Motors.

## B. *The Defendant Rocky L. Cresce*

The distinguishing aspect of Cresce's case is that whereas Craft was positively identified as the party in possession of the stolen tools while attempting a subsequent breaking and entering, Cresce, on the other hand, was not identified at the scene. He was arrested alongside Craft's automobile at a later time. The automobile did contain the inspection stickers and screwdriver that were also reportedly stolen from LeRose Motors.

The mere presence of a person in an automobile found to contain stolen property may be insufficient to support a conviction for theft, particularly where the defendant is not the owner of the vehicle. *State v. Kas,* 171 Conn. 127, 368 A.2d 196 (1976); *State v. Dall,* 305 A.2d 270 (Me. 1973); *State v. Burford,* 136 W. Va. 472, 67 S.E.2d 855 (1951). The case with regard to Cresce is rather similar to that of *State v. Burford, supra,* where the defendant was seen in the company of two other men on several occasions prior to the crime. He had registered at a campground using an alias and giving the license number of a car owned by one of the other men. The campground was in the area where the breaking and entering occurred. After the breaking and entering, one of the cars in which the defendant was seen riding was found to contain a rock hammer and a pair of gloves that were identified as being used in the breaking and entering. The court in *Burford* held this evidence was insufficient to convict.

Similarly, in the present case there is not sufficient evidence to tie Cresce to the breaking and entering at LeRose Motors. The fact that he had been seen in the company of Craft earlier, and that he was found near Craft's car at the time the car contained a few of the items stolen from LeRose, does not exclude "every reasonable hypothesis of innocence." Under this evidence, it is equally reasonable to conclude that Craft may well have been entirely responsible for the breaking and en-

tering at LeRose Motors. Even with the presence of Craft established at the Foodland market, and the fact that he was being aided by another unidentified person who was passing him the valise containing the stolen items, the evidence is still insufficient since Cresce was not identified as this person. The trial court should have sustained Cresce's motion for a directed verdict.

## II. *Validity of Search*

Craft contends that the court erred in ruling at an *in camera* hearing that the items obtained from his car could be introduced into evidence. These items consisted of the three State inspection stickers and a screwdriver. Craft argues that there was no probable cause for his arrest and that his consent to search given while he was illegally arrested was therefore invalid. We do not agree.

The State's evidence demonstrates that officers at the Foodland market had observed a suspect on the roof. Based on this eyewitness identification conveyed to other police officers assisting in the case, Craft, who fitted the description, was arrested. Upon obtaining his identity, the officers established him to be the owner of the automobile which had previously been seized but not searched. The seizure of the automobile had resulted when it was discovered adjacent to a public highway in possession of two individuals who were arrested for public intoxication.

Under certain circumstances, where the occupants of an automobile have been arrested police officers may take the automobile into custody for public safety purposes, or in order to protect the vehicle from vandalism or damage, or to protect the owner's personal property that may be left in the vehicle. The United States Supreme Court in *South Dakota v. Opperman*, 428 U.S. 364, 369, 96 S.Ct. 3092, 3097, 49 L.Ed.2d 1000, 1005 (1976), spoke to the reasons for such procedures:

"These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody,

*United States v. Mitchell,* 458 F.2d 960, 961 (CA9 1972); the protection of the police against claims or disputes over lost or stolen property, *United States v. Kelehar,* 470 F.2d 176, 178 (CA5 1972); and the protection of the police from potential danger, *Cooper v. California, supra,* [386 U.S.] [58] at 61-62 [87 S.Ct. 788 at 790, 17 L.Ed.2d 730]. The practice has been viewed as essential to respond to incidents of theft or vandalism. See *Cabbler v. Commonwealth,* 212 Va. 520 522, 184 S.E.2d 781, 782 (1971), cert. denied, 405 U.S. 1073 (1972); *Warrix v. State,* 50 Wis.2d 368, 376, 184 N.W.2d 189, 194 (1971). In addition, police frequently attempt to determine whether a vehicle has been stolen and thereafter abandoned."

While the vehicle was taken into custody by the police, no attempt was made to search it until after Craft, its owner, was arrested and had executed a written consent to search form. Craft argues that the consent form did not validate the search since it was the product of his warrantless arrest which he contends was illegal. *Cf. Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). We disagree that Craft's original warrantless arrest was illegal.

The issue of a warrantless felony arrest, in the absence of exigent circumstances, was not conclusively settled by the United State Supreme Court until *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), where the court stated that any felony arrest could be made in public without a warrant, where there was probable cause to believe the arrested person had committed a felony:

> " 'The usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony ....' Carroll v. United States, 267 US 132, 156, 45 S Ct 280, 69 L Ed 543, 39 ALR 790 (1925)." 423 U.S. at 417, 96 S.Ct. at 824, 46 L.Ed.2d at 605.

The Supreme Court concluded that this was the traditional common law rule and nothing in the history of the

Fourth Amendment's prohibition against an unreasonable search and seizure compelled a contrary result. In *State v. Duvernoy*, 156 W. Va. 578, 195 S.E.2d 631 (1973), we discussed this point in some detail not only under the Fourth Amendment but also under our counterpart found in Article III, Section 6 of the *West Virginia Constitution*. We concluded in Syllabus Points 2 and 3 as follows:

> "2. An officer, with authority to conserve the peace, may, without a warrant, arrest any person who he, upon probable cause, believes has committed or is committing a felony, though it afterwards appears that no felony was actually perpetrated."

> "3. 'Probable cause to make an arrest without a warrant exists when the facts and the circumstances within the knowledge of the arresting officers are sufficient to warrant a prudent man in believing that an offense has been committed.' Point 1 Syllabus, *State v. Plantz,* [155] W. Va. [24] [180 S.E.2d 614]."

There is little question that the right to arrest in public without a warrant, based on probable cause that the person has or is about to commit a felony, is the general if not universal rule in this country.[5] *E.g., City of Nome v. Ailak,* 570 P.2d 162 (Alaska 1977); *People v. Creach,* 79 Ill.2d 96, 37 Ill. Dec. 338, 402 N.E.2d 228 (1980); *Commonwealth v. Jones,* 457 Pa. 423, 322 A.2d 119 (1974); *State v. Cottrell,* 86 Wash.2d 130, 542 P.2d 771

---

[5] In the case of misdemeanors, in Syllabus Point 3 of *State v. Thomas,* 157 W. Va. 640, 203 S.E.2d 445 (1974), we followed the general rule that an officer cannot make a warrantless arrest for a misdemeanor unless it is committed in his presence:

"A municipal police officer has no authority, at common law or by statute, to make a warrantless arrest for a misdemeanor of a person who does not commit such an offense in his presence."

*See e.g. Works v. State,* 266 Ind. 250, 362 N.E.2d 144 (1977); *Commonwealth v. Hagan,* 464 S.W..2d 261 (Ky. 1971); *State v. Cowperthwaite,* 354 A.2d 173 (Me. 1976); *People v. Dixon,* 392 Mich. 691, 222 N.W.2d 749 (1974); *State v. Caffey,* 436 S.W.2d 1 (Mo. 1969); *State v. Macuk,* 57 N.J. 1, 268 A.2d 1 (1970); *State v. Mims,* 263 S.C. 45, 208 S.E.2d 288 (1974); 6A C.J.S. *Arrest* §20 (1975).

(1975); *Crowder v. Commonwealth*, 213 Va. 151, 191 S.E.2d 239 (1972); *Waite v. State*, 57 Wis.2d 218, 203 N.W.2d 719 (1973).

Where the warrantless arrest is made in the person's home a different rule applies. In this situation in order to make a valid warrantless arrest, in addition to a showing of probable cause that the person has committed a felony, there must be some special or exigent circumstances that precluded the obtaining of a warrant. Justice Stevens in a comprehensive opinion in *Payton v. New York*, 445 U.S. 573, 587-590, 100 S.Ct. 1371, 1381-82, 63 L.Ed.2d 639, 653 (1980), surveyed the common law history and the various state and lower court holdings in this area and concluded:

> "The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds it roots in clear and specific constitutional terms: 'The right of the people to be secure in their ... houses ... shall not be violated.' That language unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable Government intrusion.' *Silverman v. United States*, 365 US 505, 511, 81 S Ct 679, 5 L Ed 2d 734, 97 ALR2d 1277. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."

We had come to the same conclusion in *State v. McNeal*, 162 W. Va. 550, 251 S.E.2d 484, 488 (1978), where the police had made a warrantless arrest for a felony in the home of the defendant:

> "In the absence of one of these 'jealously and carefully drawn' exemptions, *Jones v. United*

*States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514, 1519 (1958), based upon an exigency of the situation making that course imperative, *Mincey v. Arizona,* 437 U.S. 385, 392-395, 98 S.Ct. 2408, [2413-2415] 57 L.Ed.2d 290 (1978); *Mc-Donald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153, 158 (1948), the police must obtain an arrest warrant before entering a home to seize a person. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The burden of proving that exigent circumstances made a warrantless arrest imperative is upon those who seek the exception. *Id.* at 455, 91 S.Ct. at 2032, 29 L.Ed.2d at 576; *Chimel v. California,* 395 U.S. 752, 762, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685, 693 (1969); *United States v. Jeffers,* 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59, 64 (1951); *McDonald v. United States, supra,* 335 U.S. at 456, 69 S.Ct. at 193, 93 L.Ed. at 158-59."

In *State v. Canby,* 162 W. Va. 666, 252 S.E.2d 164 (1979), we again considered the issue of a warrantless arrest of the defendant in his own home for a felony. We followed our holding in *McNeal, supra,* except the Syllabus Point 1 of *Canby* was written rather broadly and could well be read to mean that exigent circumstances were also required for a warrantless arrest in public for a felony.[6] In regard to arrests made in public, this is clearly not the law. *Canby's* first Syllabus must be read in the light of its facts that the defendant "was arrested at his home on July 16, 1975 without a warrant." 162 W. Va. at 667 252 S.E.2d at 166.

---

[6] Syllabus Point 1 of *State v. Canby,* 162 W. Va. 666, 252 S.E.2d 164 (1979), States:

"In order for police officers to make an arrest without a warrant, they must have had at the time of the arrest sufficient reliable evidence that they could have made a strong showing of probable cause, *and, in addition, there must be exigent circumstances,* not of the police officers' creation, which militate in favor of immediate arrest. In addition, a police officer may always make a warrantless arrest for a felony committed in his presence or when there is an outstanding warrant for the individual arrested, although the warrant may not be in the possession of the arresting officer." (Emphasis added)

In the present case, the police who arrested Craft without a warrant were aware of the attempted break-in at the Foodland market. They had been given a description of the individual seen by a police officer and a similar description by another officer who saw Craft jump from the roof and run toward him. Craft fit that description. The public arrest, supported by probable cause to believe that the suspect had committed a felony, was therefore lawful.[7]

Since the initial arrest of Craft was lawful, he is not entitled to argue that the consent to search was the product of an illegal arrest and should be discarded under *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1971), because there was no intervening event of significance between the claimed illegal arrest and the execution of the consent to search.[8]

---

[7] We have defined probable cause for making an arrest in Syllabus Point 1 of *State v. Plantz*, 155 W. Va. 24, 180 S.E.2d 614 (1971):

"Probable cause to make an arrest without a warrant exists when the facts and the circumstances within the knowledge of the arresting officers are sufficient to warrant a prudent man in believing that an offense has been committed or is being committed."

This definition is markedly similar to the United States Supreme Court definition in *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343, 349-50 (1979):

"This Court repeatedly has explained that 'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. See *Gerstein v. Pugh, supra*, 420 U.S. [103], at 111, 95 S.Ct., [854] at 861 [43 L.Ed.2d 54]; *Adams v. Williams, supra*, 407 U.S. [143], at 148, 92 S.Ct. [1921] at 1924 [32 L.Ed.2d 612]; *Beck v. Ohio, supra*, 379 U.S. [89] at 91, 85 S.Ct. [223], at 225; *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959); *Brinegar v. United States, supra*, 338 U.S. [160], at 175-176, 69 S.Ct. [1302], at 1310-1311 [93 L.Ed. 1879]; *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)."

[8] By stating the argument based on *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), we do not decide that it is applicable to a case where there has been an illegal warrantless arrest closely followed by a consent to search rather than a confession. We need not reach this point in the present case because we

The trial court properly held an *in camera* hearing to determine if the written consent to search executed by Craft was voluntary. *State v. McKinney*, 161 W. Va. 598, 244 S.E.2d 808 (1978). The form contained this statement:

"I am giving this written permission to these officers freely and voluntarily, without any threats or promises having been made, and after having been informed by said officer that I have a right to refuse this search and/or seizure."

Both officers, who witnessed Craft's signature on the form, testified that the form was read and explained to Craft before he signed it. Craft did not contradict these statements at the *in camera* hearing. In *State v. Williams*, 162 W. Va. 309, 249 S.E.2d 758, 762 (1978), we stated the test for a voluntary consent to search:

"[W]hether a consent to a search [is] in fact 'voluntary' or [is] the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances," *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48, 36 L.Ed.2d 854, 862-63 (1973) (noncustodial search of automobile), and while knowledge of the constitutional right to refuse consent to search is one factor, such knowledge is not an essential prerequisite which must be proven by the government as "the *sine qua non* of an effective consent." *Id.* at 227, 93 S.Ct. 2048, 36 L.Ed.2d 863; *accord*, syl. pt. 2, *Basham* [State v. Basham], *supra* [W. Va., 223 S.E.2d 53 (1976)].

"Where the State relies upon consent to justify the lawfulness of a search, it has the burden of proving that the consent was, in fact, freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), and in *Hacker* [State v. Hacker], *supra*, [W. Va., 209 S.E.2d 569 (1974)] we held in the syllabus that

have found the initial warrantless arrest of Craft to be lawful and therefore *Brown* does not apply. *See United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

the State must prove by a preponderance of evidence that a warrantless search was legal."

It is obvious that the State met its burden of proof that the consent to search given by Craft was voluntary and there was no error in the admission of the evidence found in Craft's car.

## III. *Evidence of Other Crimes*

Craft's final ground of error is that his trial was prejudiced by evidence of the commission of crimes other than the one for which he was being tried.

The evidence of another crime presented by the State was the attempted commission of the breaking and entering of Halstead's Foodland at the time the defendant Craft was identified in possession of the stolen property. No objection was made by the defense when this evidence was introduced at trial. Ordinarily, evidentiary objections of a nonconstitutional nature not shown to have been made in the trial court cannot be considered on appeal. *State v. Burton,* 163 W. Va. 40, 254 S.E.2d 129 (1979); *State v. Thomas,* 157 W. Va. 640, 203 S.E.2d 445 (1974); *State v. Knotts,* 156 W. Va. 748, 197 S.E.2d 93 (1973).

Even if an objection had been made and overruled at trial, it is apparent that the evidence of the attempted breaking and entering of Halstead's Foodland was not improper. In Syllabus Point 12 of *State v. Thomas,* 157 W. Va. 640, 203 S.E.2d 445 (1974), we set forth the circumstances under which evidence of collateral crimes would be permitted:

"The exceptions permitting evidence of collateral crimes and charges to be admissible against an accused are recognized as follows: the evidence is admissible if it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; and (5) the identity of the person

charged with the commission of the crime on trial."

The evidence for the attempted breaking and entering of Halstead's Foodland tends to establish three of these aspects. Since the objects that were stolen in the first breaking and entering were the tools utilized in the commission of the subsequent offense, evidence of the subsequent offense provides an explanation of the motive for the first. Also, since evidence of possession of the stolen goods stemmed from the discovery of the subsequent offense, evidence of the subsequent offense was admissible in that it tended to establish the commission of the first.

Finally, the identification of the defendant Craft arose from his participation in the second offense while in possession of the goods stolen from the first. Evidence of the second offense was thus admissible as tending to establish "the identity of the person charged with the commission of the crime on trial." 157 W. Va. at 655, 203 S.E.2d at 455.

In *State v. Frasher*, ____ W. Va. ____, 265 S.E.2d 43 (1980), we discussed the exceptions in *Thomas*, concluding that:

"[A]ll relevant facts and circumstances tending to establish any of the constituent elements of the crime of which the defendant is accused may be made to appear. Thus, evidence of other criminal acts has been held admissible by this court when they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged. Such evidence is admissible if it is ... so associated that proof of one tends to prove the other ...." 265 S.E.2d at 50, *quoting Kugzruk v. State*, 436 P.2d 962, 967 (Alaska 1968) *and United States v. Wall*, 225 F.2d 905, 907 (7th Cir. 1955), *cert. denied*, 350 U.S. 935, 76 S.Ct. 307, 100 L.Ed. 816 (1956).

*See also State v. Haverty,* ___ W. Va. ___, 265 S.E.2d 727 (1980); *State* v. *Watson,* ___ W. Va. ___, 264 S.E.2d 628 (1980); *State v. Arnold,* 159 W. Va. 158, 219 S.E.2d 922 (1975); *State v. Ramey,* 158 W. Va. 541, 212 S.E.2d 737 (1975), *overruled on other grounds, State v. McAboy,* 160 W. Va. 497, 236 S.E.2d 431 (1977).

Consequently, we find that no error was committed in receiving the evidence of collateral crimes under the circumstances of this case.

In conclusion, based on the foregoing law, we find that the conviction of the defendant, Robert L. Craft, should be affirmed; but, the conviction of the defendant, Rocky L. Cresce, must be reversed and remanded for entry of a judgment of acquittal since there was insufficient evidence to support his conviction and under double jeopardy principles he is entitled to a judgment of acquittal.[9]

> *Judgment Affirmed*
> *as to defendant*
> *Craft*
> *Judgment Reversed*
> *and Remanded as to*
> *defendant Cresce*

---

[9] We discussed the double jeopardy principle at some length in *State v. Frazier,* 162 W. Va. 602, 252 S.E.2d 39 (1979), and concluded in Syllabus Point 4:

"The Double Jeopardy Clause of the Federal and this State's Constitutions forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding."

*See also State v. Burks,* ___ W. Va. ___, 267 S.E.2d 752 (1980); *State v. Milam,* 163 W. Va. 752, 260 S.E.2d 295 (1979).